**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH R. KRATZ | ) | CASE NO.: |
| 8121 Peach Flare Street | ) | |
| Las Vegas, Nevada  89143, | ) | JUDGE: |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -vs.- | ) | |
| | ) | **COMPLAINT WITH JURY** |
| TRANSITION STUDIOS, LLC | ) | **DEMAND** |
| 1375 Euclid Avenue, Suite # 410 | ) | |
| Cleveland, Ohio  44115, | ) | **VERIFIED REQUEST** |
| | ) | **FOR INJUNCTIVE RELIEF** |
| -and- | ) | ***(ORAL HEARING REQUESTED)*** |
| | ) | |
| CHRISTOPHER S. RECH | ) | |
| 25685 Quarry Ridge Road | ) | |
| Columbia Station, Ohio  44028 | ) | |
| | ) | |
| *Also Serve:* | ) | |
| Christopher S. Rech | ) | |
| c/o Transition Studios, LLC | ) | |
| 1375 Euclid Avenue, Suite # 410 | ) | |
| Cleveland, Ohio  44115, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| RALPH MCGREEVY | ) | |
| 403 Ohio Street | ) | |
| Huron, Ohio  44839 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| JOHN FECEK | ) | |
| 16630 Heatherwood Lane | ) | |
| Chagrin Falls, Ohio  44023 | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| ANDREW M. HALE | ) | |
| c/o Hale & Monico | ) | |
| 53 West Jackson Boulevard, Suite # 334 | ) | |
| Chicago, Illinois  60604 | ) | |

1

)
     -and-                           )
)
CONVICTING A MURDERER     )
DOCU-SERIES, LLC            )
625 West Bagley Road        )
Berea, Ohio  44017          )
)
     *Also Serve:*            )
     Christopher S. Rech, ***Sole Mbr.*** )
     c/o Transition Studios, LLC     )
     1375 Euclid Avenue, Suite # 410 )
     Cleveland, Ohio  44115,      )
)
     -and-                           )
)
THE DAILY WIRE, LLC       )
1831 12th Avenue, South, Suite # 460 )
Nashville, Tennessee  37203    )
)
     *Also Serve:*            )
     The Daily Wire, LLC       )
     c/o Capitol Corporate Services  )
     992 Davidson Drive, Suite B    )
     Nashville, Tennessee  37205   )
)
                  **Defendants.**    )

**NOW COMES THE PLAINTIFF, Kenneth R. Kratz,** by and through his undersigned counsel, and for his Complaint states, alleges, and avers as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Kenneth R. Kratz brings this cause of action against Defendants Transition Studios, LLC, Christopher S. Rech, Ralph McGreevy, John Fecek, Andrew M. Hale, and Convicting a Murderer Docu-Series, LLC, for multiple instances of breach of contract, unjust enrichment, civil conspiracy, and fraud, as well as for an Accounting.

2

2.      Over the course of several years, beginning in early 2017, Defendants took advantage of Plaintiff's diminished public profile caused by vitriol and hate leveled at Plaintiff as a result of a NETFLIX docuseries entitled "Making a Murderer," (in which Plaintiff was portrayed as a villain for having faithfully and professionally done his job as a duly elected District Attorney in bringing and prosecuting charges against Steven Avery and Brendan Dassey), in order to unjustly enrich themselves at Plaintiff's expense.

3.      This civil conspiracy was accomplished when the Defendants fraudulently induced Plaintiff to sign agreements in which Plaintiff was promised monies which Defendants, upon information and belief, never intended on actually paying Plaintiff and, in fact, to date have not paid to Plaintiff.

4.      Plaintiff realized the full breadth and scope of this conspiracy in late 2019 and began expressing his concerns in communications with interested parties relative to the Defendants in early 2020, which communications, when brought to the attention of Defendants, prompted Defendants to begin the process of cutting off Plaintiff's access to and limiting his expectations concerning the very project he had contracted with them on, ultimately culminating in Defendants breaching their contractual arrangement with Plaintiff altogether and leading directly to the instant litigation.

**<u>PARTIES TO THIS CAUSE OF ACTION</u>**

5.      Plaintiff Kenneth R. Kratz is an Individual, with an address of 8121 Peach Flare Street, Las Vegas, Nevada, 89143.

3

6.      Defendant Transition Studios, LLC, is a Limited Liability Company, duly organized and registered under the laws of the State of Ohio, and with an address of 1375 Euclid Avenue, Suite # 410, Cleveland, Ohio, 44115.

7.      Defendant Christopher S. Rech is an Individual, with an address of 25685 Quarry Ridge Road, Columbia Station, Ohio, 44028, and, upon information and belief, was at all times relevant a Co-Founder, Member, and Corporate Officer of Transition Studios, LLC, with an address of 1375 Euclid Avenue, Suite # 410, Cleveland, Ohio, 44115, and the Sole Member of Convicting a Murderer Docu-Series, LLC, with an address of 625 West Bagley Road, Berea, Ohio, 44107.

8.      Defendant Ralph McGreevy is an Individual, with an address of 403 Ohio Street, Huron, Ohio, 44839, and, upon information and belief, was at all times relevant a Co-Founder and Member of Transition Studios, LLC.

9.      Defendant John Fecek is an Individual, with an address of 16630 Heatherwood Lane, Chagrin Falls, Ohio, 44023, and, upon information and belief, was at all times relevant a Corporate Officer of Transition Studios, LLC.

10.     Defendant Andrew M. Hale is an Individual, whose primary place of business is located at Hale & Monico, 53 West Jackson Boulevard, Suite # 334, Chicago, Illinois, 60604.

11.     Defendant Convicting a Murderer Docu-Series, LLC, is a Limited Liability Company, duly organized and registered under the laws of the State of Ohio, whose Sole Member is, upon information and belief, Defendant Christopher S. Rech, and with an address of 625 West Bagley Road, Berea, Ohio, 44107.

4

12.     Defendant The Daily Wire, LLC, is a Limited Liability Company, duly organized and registered under the laws of the State of Texas, with an address of 1831 12th Avenue, South, Suite # 460, Nashville, Tennessee, 37203.

## STATEMENT OF JURISDICTION AND VENUE

13.     Defendants Christopher S. Rech, Ralph McGreevy, and John Fecek reside and conduct and transact business, Defendants Andrew M. Hale and The Daily Wire, LLC, conduct and transact business, and Defendants Transition Studios, LLC, and Convicting a Murderer Docu-Series, LLC, each have offices and conduct and transact business, within the boundaries of the Northern District of Ohio.

14.     Additionally, the events that have given rise to this cause of action predominantly occurred within the boundaries of the Eastern Division of the Northern District of Ohio.

15.     Finally, there is Diversity of Citizenship between the parties to this cause of action above, and the amount in controversy is, upon information and belief, in excess of $75,000.00, and so this Court has jurisdiction over this cause of action.

## FACTS

16.     Plaintiff Kenneth R. (Ken) Kratz (hereinafter "Kratz") served as an elected District Attorney in the County of Calumet, State of Wisconsin, between 1992 and 2010. In 2005, Plaintiff was appointed Special Prosecutor, charged with overseeing the investigation and prosecution of Steven Avery (hereinafter "Avery") with respect to the murder and mutilation of 25-year-old photographer Teresa Halbach (hereinafter "Halbach").  Avery's trial and sentencing occurred in 2007.

17.     In December, 2015, NETFLIX released a 10-part docuseries entitled "Making a Murderer," with its main storyline including the possibility that Wisconsin Law

Enforcement and Prosecution officials knowingly and intentionally "framed" Avery for Halbach's murder.

18.     Public interest and conversation about the case grew to historic levels after the series' release, which included a significant number of the 40+ million viewers believing the false narrative advanced by the series—that is, that local police officers (including Deputy Andrew (Andy) Colborn) and the prosecution team (led by the Plaintiff) conspired to convict an innocent Junk Dealer (Avery) and his 16-year-old nephew (Brendan Dassey) for the murder of Halbach.

19.     As a result of the NETFLIX series, vitriol from viewers led to threats against Plaintiff, which eventually led to Plaintiff's Private-Practice Law Firm being shuttered. Plaintiff has received constant threats and attempts to "cancel" Plaintiff's ability to practice law.  After specific threats to blow up Plaintiff's house were received, Plaintiff was forced to move away from his then-home in the State of Wisconsin in March of 2020, and to permanently relocate to an (at that time) undisclosed State in the Western United States.

20.     Due to the attention garnered by the NETFLIX series, Plaintiff was contacted and asked to write a book, which would serve as rebuttal to the "Making a Murderer" series.  BenBella Books (located in Austin, Texas) published Plaintiff's book, titled "AVERY: The Case Against Steven Avery, and What Making a Murderer Gets Wrong," in February, 2017.

21.     As demand for additional content grew, Plaintiff signed a development deal with NBC-Universal Studios and Blumhouse Productions to create, develop, and sell a "Ken Kratz Project" to a TV or streaming network.  Plaintiff provided exclusive trial work product, interviews, and insights as the project created a "sizzle reel" used to show

prospective networks the prosecutor's rebuttal to allegations raised in the NETFLIX series. Plaintiff participated in four "pitch" meetings with NBC producers and networks.

22. Plaintiff's agreement with NBC expired on January 31, 2018. Attempts to sell the developed series to one of several networks proved unsuccessful. In January, 2018, an Attorney by the name of Andrew M. (Andy) Hale (hereinafter "Hale") contacted Plaintiff, expressing an interest in developing and producing the "Ken Kratz Project" through Defendant Transition Studios, LLC, in Cleveland, Ohio. Hale claimed that he had served as "Executive Producer" on a previous project ("A Murder in the Park"), where he (Hale) indicated that he (Hale) had partnered with Defendant Christopher S. (Shawn) Rech to bring that project to NETFLIX.

23. To convince Plaintiff to allow use of his "exclusive content" and to produce a new 10-part docuseries, an offer was made by Hale and his "partner," Defendant Christopher S. (Shawn) Rech, the owner of Defendant Transition Studios, LLC. On January 15, 2018, the terms of the agreement were reduced to a signed communication entitled "Memorandum of Understanding" [**Attached and incorporated by reference in this pleading as "EXHIBIT 1"**].

24. The January 15, 2018, agreement was signed by Defendant Christopher S. (Shawn) Rech on behalf of Defendant Transition Studios, LLC (hereinafter "Transition"), with a promise to Plaintiff to present a long-form contract with the "same terms" on February 1, 2018. A long-form "Development and Rights Acquisition Agreement" was in fact executed by the parties on or about February 2, 2018 (hereinafter the "Agreement") [**Attached and incorporated by reference in this pleading as "EXHIBIT 2"**]. The contract was signed by Defendant Christopher S. Rech, under the name of "Shawn Rech," as a "Member" of Defendant Convicting a Murderer Docu-Series, LLC, and by

Plaintiff. Upon information and belief, Defendant Christopher S. (Shawn) Rech (hereinafter "Rech") is the Sole Member of Convicting a Murderer Docu-Series, LLC (hereinafter "CAM").

## STATEMENT OF CLAIM

### COUNT I – BREACH OF CONTRACT

25. Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 24 as if fully rewritten herein.

26. Defendant Rech (*D/B/A* Defendants Transition and CAM) raised money through loans first on or around February 1, 2018, and additional loans between 2020 and 2023, to produce the 10-part CAM docuseries. Rech, and his agents, including Defendants Ralph McGreevy (hereinafter "McGreevy") and John Fecek (hereinafter "Fecek"), have consistently refused to identify the lenders, terms, dates, and amounts of monies received; what collateral was used to secure the loans; what repayment terms there were; and what sources of revenue were used to pay back the loans. Upon information and belief, over $3 million was raised by Defendants for the CAM project between 2018 and 2023.

27. Section 5(b)(i) of the Agreement stated: "Kratz shall receive a profit participation equal to 15% of the Producer's share of Net Profits, calculated on the same basis as Producer's net profit participation." And, as per Section 5(c), "'Net Profits' shall mean any non-returnable revenue arising from the distribution, merchandising or any other exploitation of the Series and/or any element thereof, including contingent compensation, format fees, bonuses and royalties, as well as any additional non-returnable sums actually received by or irrevocably credited to Producer (and/or any of its agents or representatives for its account), as a result of any other exploitation of the

Property and/or any element thereof, less Expenses. 'Expenses' shall mean a sum equal to any and all actual, direct out-of-pocket costs and expenses actually incurred by Producer in connection with the development, production and post-production of the Series and its efforts to obtain a Series commitment as set forth herein, including but not limited to delivery costs, provided, that for the purposes of this calculation, the production budget shall be deemed not to exceed $2,500,000, and sales commissions shall not exceed 12.5%."

28.　From the execution of the original Agreement, dated February 2, 2018, to the present, Rech, and his agents, including McGreevy and Fecek, have failed to identify what, if any, actual, direct out-of-pocket costs and expenses have been incurred in the project.  Demands for detailed revenue and expense records have been made of Rech, and of his agents, including McGreevy and Fecek.  Demands have subsequently been made by Plaintiff's counsel—to Rech, McGreevy, and Fecek—for revenues and expense records associated with the CAM project.  No meaningful response was provided by any of the Defendants for over six (6) months, amounting at best to bad-faith conduct on the part of the Defendants.

29.　Section 7(xi)(c) of the Agreement states:  "Kratz shall be entitled to review and be consulted on the final shooting scripts of the television programs, motion pictures or other properties produced hereunder, it being understood that further changes to such final shooting scripts may be made by Producer…".

30.　On October 29, 2021, Attorney for Transition Dorothy Richardson provided Plaintiff with the following assurances:  "Though the project isn't completely finished, it is at a point in which Transition is comfortable starting the sales process. You will have a chance to review the project before it's delivered."

9

31.     Despite numerous inquiries from Plaintiff to Defendants to review the completed episodes *before* their release, to ensure no errors or omissions in the project, Plaintiff was *denied* that opportunity by Defendants.  Upon information and belief, the Daily Wire+ released the "Convicting a Murderer" 10-part series on their streaming platform, in consecutive weeks, between September and December of 2023.  At no time before the release of any of the ten (10) episodes was Plaintiff given an opportunity to review the finished product for errors and omissions.

32.     Upon a cursory review of the finished and released CAM project, Plaintiff has identified a substantial number of errors and omissions in the docuseries.

33.     Although the Agreement is silent as to the completion date, Rech represented to Plaintiff before execution that the "project will be completed by September, 2019."

34.     The project was not released until September of 2023, four (4) years later than represented.  The delays in production and completion were *not* the fault of Plaintiff, according to direct correspondence from Rech dated December 25, 2019.  Plaintiff relied upon representations as to the project completion date, and suffered financial and reputational harm as a result of Defendants' failure to comply with the representations upon which Plaintiff had relied.

35.     After the deal was announced wherein Daily Wire+ had purchased the series and had set it for release in September of 2023, Plaintiff was prevented from speaking with Executive Producers Ben Shapiro or Candace Owens, or with any of the other producers of CAM.  After having been guaranteed input *before* the release of the project, the intentional exclusion of Plaintiff at the post-production stage constitutes a bad-faith Breach of Contract on the part of Defendants.

36.     On February 6, 2020, Plaintiff transmitted a demand for information regarding the status of the CAM project.  Specifically, on February 6, 2020, Plaintiff again demanded "to be updated regarding whether any sales negotiations are underway, and what representations have been made to 'potential buyers' specifically regarding 'Ken Kratz's participation in the project' and the 'status' of the project (how close to completion it is)."  Defendants have consistently failed to provide any meaningful updates to date.

37.     On February 23, 2023, Plaintiff made the following demand of Rech:  "I would like to talk to the investors directly, to share my ideas directly.  Assuming you are not hiding something from them or me, it should go smoothly.  I once again demand to know: how much money was raised for this project; from whom; what was the money spent on?"  The Defendant responded to that inquiry with the following:  "There are no investors, just lenders who are due repayment and royalties."  On August 9, 2019, however, Rech had indicated that "Brad Owen and his wife are the largest investors."

38.     **<u>EXHIBIT 1</u>** sets forth the intent of the parties as to the contract terms.  The parties had agreed therein that a "long-form" contract would be drafted, "with the same terms" as the January 15, 2018, Memorandum of Understanding.  One of the agreed-upon terms in "**<u>EXHIBIT 1</u>**" was as follows:  "Producers will advance Kratz $5000 by March 1st [2018] towards existing Avery (and any forthcoming Dassey) adaptation of book rights for scripted film(s), with $45,000 due to fully execute rights.  This must be fully paid by February 1, 2020."

39.     **<u>EXHIBIT 2</u>**", the Agreement dated February 2, 2018, neglected to restate the terms for the purchase of Plaintiff's book rights.  Rech assured Plaintiff on February 2, 2018, that the book rights would be covered in its own future contract—which was never presented for execution.  On May 24, 2019, Rech informed Plaintiff that he had

decided *not* to pay the $45,000 promised for the book rights, stating that "he had only purchased an option to buy the rights, and the project was opting NOT to fully execute the deal."

40.    As per Section 4 of the Agreement:  "Kratz will be entitled to an end-roll screen credit in connection with consulting services performed hereunder, the form and placement of which shall be at Producer's sole discretion."

41.    After the release of "Convicting a Murderer", Plaintiff was given no end-roll screen credit for consulting services, or in recognition of the massive exclusive work product and intellectual property provided by Plaintiff to the project.

42.    As per Section 6 of the Agreement:  "Producer will obtain an errors and omissions insurance policy for the Series in a minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate, and will name Kratz as an additional insured on such policy."

43.    Upon release of the project, Plaintiff was *not* named as an insured on the "Errors & Omissions" policy obtained by Rech for "Convicting a Murderer."

44.    As a result of those instances of Breach of Contract by Defendants above, Plaintiff has been damaged in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for in Count VI of this Complaint.

## COUNT II – UNJUST ENRICHMENT

45.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 44 as if fully rewritten herein.

46.    As per Section 15 of the Agreement:  "The Parties hereby agree to do all such further acts and deeds consistent with the terms hereof that may from time to time

be reasonably required to confirm the Parties' respective rights and obligations hereunder. The Parties further agree to act in good faith hereunder so as to not frustrate the intent of this Agreement…".

47.    Beginning in December of 2019, and thereafter, Plaintiff discovered that it was "more probable than not" that Rech, acting as an Executive Officer for Transition and CAM, used a substantial share of the monies raised for the "Convicting a Murderer" project to support his own lavish lifestyle, and to satisfy personal and business debts which were unrelated to the project.

48.    On January 19 and 20, 2020, Plaintiff spoke with the Executive Producer of the project, Defendant Hale, by telephone, informing Hale of Plaintiff's suspicions, and provided historical facts to Hale to support the on-going Embezzlement allegations.  After Hale performed his own independent investigation, he assured Plaintiff that he would "fix the problem" and not allow Rech to "retaliate or punish Plaintiff" for becoming a whistleblower as to Defendant's potential felonious activities.  Arrangements were made for a face-to-face meeting to resolve the issue in January of 2020.

49.    After informing Rech of Plaintiff's allegations, Executive Producer Hale never again spoke to Plaintiff, or to Plaintiff's legal counsel, allowing Rech to retaliate against Plaintiff for the duration of the contract.  After learning of Rech's unlawful behavior, Hale signed an agreement drafted by Attorney for Transition and CAM Dorothy Richardson extricating himself form the project, allowing Plaintiff, and all of the other project investors and stakeholders, to suffer financial jeopardy and losses due to the misappropriation of project funds.  Affirmative actions by Hale have prevented Plaintiff from determining Hale's involvement in fraud and breach of contract, and any Statutes of Limitations, as relating to Hale, should be tolled as of January 31, 2020.

13

50.     On January 29, 2020, Plaintiff notified Executive Producer Hale, Attorney for Transition and CAM Dorothy Richardson, and Rech as to his Embezzlement concerns, demanding that the project perform an accounting (or forensic audit) to determine what, if any, misappropriations of funds had occurred.  Specifically, Plaintiff indicated as follows: "Based upon what I perceive to be the possible misappropriation of funds, the possible theft of intellectual property, a resurfacing of Mr. Rech's drug and alcohol addiction, and the apparent unwillingness of any response by Mr. Rech, Mr. Hale, or Attorney Richardson (as representative of Mr. Rech and the CAM project) to account for the monies raised for the AVERY project, the monies expended in furtherance of the AVERY project, or other financial irregularities…I am withdrawing from the Convicting a Murderer project."

51.     On January 30, 2020, Attorney Dorothy Richardson (who self-identified as the attorney for Shawn Rech personally, for Transition, and for CAM) informed Plaintiff that:  "You are not legally entitled to unilaterally terminate the Agreement or to rescind any of the rights granted… You are not permitted under the Agreement to 'withdraw' from the project or to take any materials provided to the Producer in connection with the project. Also, you are not permitted to shop your project to any third parties… Further, the Agreement does not require the Producer to provide an accounting of expenses until and unless the series has been sold to a third party, nor does it require the Producer to disclose the amount of investment funds raised… If you proceed with a press release tomorrow, or if you attempt to transfer any of the rights granted under the Agreement, or if you permit the use of any of the rights granted for any purpose that would impair the use thereof by the Producer, you will be in breach of the Agreement."

52.    Defendants have continually failed to provide project status, or other relevant, updates, despite frequent and periodic demands from Plaintiff.  As an example, on February 1, 2021, Plaintiff wrote to Rech and his Attorney, Dorothy Richardson: "Please provide a meaningful update regarding the project. My question to Attorney Richardson is whether an audit or an accounting of the money received by Mr. Rech has been performed, with oversight of what the 'Avery' money was spent on?  If this audit has not been conducted, why not?"

53.    As a result of those instances of Unjust Enrichment by Defendants above, Plaintiff has been damaged in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for in Count VI of this Complaint.

<u>COUNT III – CONVERSION OF PLAINTIFF<br/>KENNETH R. KRATZ'S INTELLECTUAL PROPERTY</u>

54.    Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 53 as if fully rewritten herein.

55.    Exclusive work product and intellectual property regarding the preparations for and prosecution of *State v. Avery* and *State v. Dassey* were provided to Rech by Plaintiff, and by those individuals directed by Plaintiff to provide additional reports and files.  The exclusive *Avery* materials proved so valuable to Rech that Plaintiff's work product and intellectual property served as collateral for all of the Defendants' Avery Project loans.  Section 10(c) of the Agreement guaranteed:  "[Each Party] has not made and will not make any grant, assignment, commitment or do or permit any act which will or might conflict with or impair any of the rights granted to the Parties hereunder…"

Plaintiff alleges that the transfer of Plaintiff's intellectual property rights to a third-party violated those express terms of the Agreement with Defendants.

56.  Upon information and belief, in or around December of 2018, Transition employee Brenda Schuler (hereinafter "Schuler") gave exclusive case materials and insights to Attorney Michael Griesbach (hereinafter "Griesbach"), directly leading to the Filing of a Lawsuit in Federal Court against NETFLIX by Andrew (Andy) Colborn in December of 2018.  Griesbach is a competitor of Plaintiff, having written at least two books on the Steven Avery cases.  Upon information and belief, Schuler and Griesbach also colluded to *exclude* Plaintiff from the NETFLIX Civil Case Filings, all to Plaintiff's financial and reputational detriment.

57.  On January 29, 2020, Plaintiff sent correspondence to Attorney Dorothy Richardson, counsel for Rech, Transition, and CAM, demanding to know Defendant's role in transferring his intellectual property:  "I'm demanding to know whether your client was involved in, or complicit with, the theft of my intellectual property (the stuff I produced or developed, most specifically FOR THIS PROJECT)--you will know it's MY stuff, because I can provide ALL OF THE EARLIER DRAFTS of those materials that I created---the early drafts of those materials is how you know it's a document that you can PROVE was yours, but later stolen and either sold or given away to a competitor.  The redistribution of ANY of those copyright protected and EXCLUSIVE materials of mine, to any third party, much less one of our competitors (e.g. Mike Griesbach) is THEFT (in criminal court) and CONVERSION (in a tort claim)--that distinction is for your client, when he asks how HE can be charged with both criminal theft and be sued for civil conversion, with the same facts--I'm sure he'll be told why HE, HIS COMPANY, and not just the employee/agent who he allowed to leak the materials (her name is Brenda Schuler, her husband owns an

16

international company, if you are considering whether to implead someone). If your client won't answer that question (whether he helped Brenda fuck me and my reputation further), how do you expect me to continue down this path with him?"

58.     Defendants contractually became Plaintiff's "agent(s)" with respect to the protection of Plaintiff's intellectual property. Specifically, Section 14 of the Agreement states as follows: "Producer may prosecute any action, and Kratz irrevocably grants to Producer full power and authority to do so, in Kratz's name, and to take any and all steps as Producer, in Producer's sole discretion may elect, to restrain and prevent others from so using such rights. Kratz further agrees to execute, acknowledge and deliver to Producer any and all further documents, assignments and other instruments, in form approved by counsel for Producer, necessary or expedient to carry out and effectuate the purposes and intent of the parties as herein expressed and/or as deemed necessary or desirable to establish, or defend, Producer's title to any material created hereunder or rights granted hereunder. If Kratz shall fail to so execute and deliver any such assignment or other instruments within ten (10) days of being presented, Producer shall be deemed to be, and Kratz irrevocably appoints Producer, the true and lawful attorney-in-fact of Kratz to execute and deliver any all such assignments and other instruments in the name of Kratz, which right is coupled with an interest. Producer shall provide Kratz with copies of any such instruments or documents executed, verified, acknowledged and delivered by Producer on Kratz's behalf hereunder, provide that Producer's inadvertent failure to provide such copies will not be deemed a breach hereunder."

59.     Rech has denied any knowledge of his employee Schuler having transferred Plaintiff's intellectual property without Plaintiff's consent. On February 9, 2019, however, Rech wrote to CAM's legal counsel, (Ted Gerdes), communicating the

following discovery:  "One of our Producers [Brenda Schuler] has amassed thousands of pages of data, evidence, photos, videos, transcripts, etc., while researching for a couple authors who wrote books on the Avery/Dassey situation.  She has shared the library with us, and I just learned she shared it with Andy Colborn's defamation lawyers."

60.     As a result of those instances of Conversion of Plaintiff's Intellectual Property by Defendants above, Plaintiff has been damaged in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for in Count VI of this Complaint.

<u>COUNT IV – FRAUD</u>

61.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 60 as if fully rewritten herein.

62.     Fraudulent representations made by Defendants to induce Plaintiff to participate in, (via the Agreement and otherwise), and then remain involved with, the project included, without limitation:

A.     On January 7, 2018, Rech wrote to Plaintiff, asking to be given an opportunity to make the "Convicting a Murderer" docuseries:  "I believe we are the perfect production company to make this docu-series, clear your name, correct the record and restore some of the things you lost as a result of 'Making A Murderer,' including your financial security.  If you entrust us with your story, we'll be honored to deliver a well-made, persuasive, clinical dissection of 'Making A Murderer,' with some fascinating human interest stories woven in for good measure (the lengths to which Avery supporters went to personally hurt those on your side)."

B.     Rech represented to Plaintiff that the "Convicting a Murderer" Project was to have Emmy Award-Winning Director / Producer Brandon Kimber

overseeing the production.  On February 6, 2020, Plaintiff notified the Attorney for the "Convicting a Murderer" project:  "I've told you that Mr. Rech has failed to provide notice of project status, Mr. Rech 'hid' the fact from me that Brandon Kimber (the Emmy award winning DP for Transition Studios) had left Mr. Rech's employ--why wasn't Ken Kratz informed of Kimber's departure in a timely manner, so that Mr. Kratz could determine if he wished to leave the project--clearly, the initial representations made to Kratz about who was making the project, Brandon Kimber (with his awards so prominently displayed by Mr. Rech)?"  Without Rech's false representations and omissions of relevant updates regarding Brandon Kimber, Plaintiff would not have continued to participate in the project, or at the very least would have publicly distanced himself from the project.

C.     Defendant was told on many occasions—during the pre-production, production, and post-production phases of the project—that Schuler should have no direct involvement in the production of "Convicting a Murderer".  Representing the basis for his clear position, Plaintiff communicated to Defendants:  "What continued involvement does Brenda Schuler have with the project?  Has Ms. Schuler been given ANY authority, other than fact-checker, as represented by Mr. Rech?  Is Ms. Schuler a 'Producer' on [CAM]?  Will Ms. Schuler have any further access to CAM materials, or will she be at all involved in this project at any point in the future--I reiterate I believe Ms. Schuler has stolen intellectual property from me, and transferred same without my consent.  I made the same allegation regarding the CAM materials, since I was told that Ms. Schuler HAD NO AUTHORITY to transfer, sell, or give away materials either created or gathered by Ken Kratz, any of his agents, or the materials gathered in direct advancement of

19

the CAM project." Defendant continually notified Plaintiff that "Brenda Schuler is nothing more than a fact-checker on the project, and is NOT a Producer." Plaintiff alleges that, without the Defendants' false representations regarding this fact, Plaintiff would not have continued to participate in the project, or at the very least would have publicly distanced himself from the project. Indeed, upon information and belief, Schuler had no education, training, or experience in film-making prior to 2018. Schuler had served as Plaintiff's "fact-checker" on his Avery-related projects, including his published book, "AVERY: The Case Against Steven Avery and What Making a Murderer Gets Wrong", and his own Avery Docuseries Project, developed and shopped by NBC-Universal Studios, with collaboration from Blumhouse Productions, between 2016 and 2017. As such, Schuler was incompetent to be given "Producer" status on the "Convicting a Murderer" project. Schuler in fact was named a "Producer" of "Convicting a Murderer" by Rech as early as January of 2019, despite having no film-making background. Schuler is listed in the end-roll screen credits and on "*www.IMDB.com*" as a "Producer" of the "Convicting a Murderer" project.

D.      Between 2020 and 2023, Rech, in conjunction with his agents, made materially false representations to media sources about the true status of the "Convicting a Murderer" project, including intentional misrepresentations as to how close the "Convicting a Murderer" project was to completion. Plaintiff alleges that, without Rech's false representations to the media regarding the expected date of completion, Plaintiff would not have continued to participate in the project, or at the very least would have publicly distanced himself from the project (given Rech's continued public deceptions).

63.     As a result of those instances of Fraud by Defendants above, Plaintiff has been damaged in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for in Count VI of this Complaint.

## COUNT V – CIVIL CONSPIRACY

64.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 63 as if fully rewritten herein.

65.     The Defendants' unlawful conduct, as alleged above, constitutes a malicious combination involving two or more persons to injure Plaintiff in a way not competent for one alone, constituting a civil conspiracy.

66.     Specifically, upon information and belief, Defendants Rech, McGreevy, Fecek, and Hale conspired, as individuals and under the auspices of the corporate structure of Defendant Transition and, in the case of Defendant Rech, also under the auspices of Defendant CAM, to engage in the unlawful conduct above, to Plaintiff's detriment and the Defendants' benefit, as evidenced not only by the unlawful actions themselves, but by the refusal of each of the Defendants to communicate with Plaintiff as to project updates and other project status requests, (except through legal counsel and/or by way of obfuscation, as alleged above).

67.     As a result of those instances of Civil Conspiracy by Defendants above, Plaintiff has been damaged in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for in Count VI of this Complaint.

## COUNT VI – ACCOUNTING

68.     Plaintiff incorporates by reference each and every allegation contained in Paragraphs 1 through 67 as if fully rewritten herein.

21

69.     A business and/or fiduciary relationship existed between Plaintiff and Defendants.

70.     Plaintiff is owed monies by Defendants which remain unknown, and which monies Defendants have failed to remit to Plaintiff.

71.     The amount Plaintiff is owed cannot be calculated without an Accounting.

72.     Defendants are, upon information and belief, in possession of the Information necessary for the calculation, but have denied Plaintiff access to it such that Plaintiff would be able to determine the amount that he is owed.

73.     Plaintiff's remedies are potentially inadequate in order to fully pursue his claims against Defendants.

74.     Additionally, Plaintiff further states that, unless they are enjoined from doing so, Plaintiff believes that Defendants will remove, abscond, or hide assets, which will cause Plaintiff irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, in light of the foregoing, the Plaintiff, Kenneth R. Kratz, prays for Judgment against the Defendants, Transition Studios, LLC, Christopher S. Rech, Ralph McGreevy, John Fecek, Andrew M. Hale, and Convicting a Murderer Docu-Series, LLC, as follows:

(a)     An Order from this Honorable Court, enjoining the Defendants from releasing any monies able to be claimed by the Plaintiff under the terms of the "Development and Rights Acquisition Agreement" executed by the parties on or about February 2, 2018, from the date of issuance of the Order through the pendency of this action (the Affidavit of the Plaintiff, Kenneth R. Kratz, in Support of this Injunctive Relief is appended hereto and incorporated by reference herein);

(b)     That an **Oral Hearing** as to the Injunctive Relief prayed for above be scheduled by this Honorable Court for as soon as is practicable;

**(c)**    An Accounting, pursuant to Count VI of this Complaint;

**(d)**    A Judgment for compensatory damages against Defendants as to Counts I through V above, in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for above;

**(e)**    A Judgment for punitive damages against Defendants as to Counts I through V above, in an amount to be determined at Trial, but which amount is expected to exceed $75,000.00 after the Accounting prayed for above;

**(f)**    An Order awarding the Plaintiff, Kenneth R. Kratz, the costs incurred in this litigation, including attorney's fees; and

**(g)**    Any and all such other relief as this Honorable Court deems just and proper.

Respectfully Submitted:


_/s/ Robert E. Adelman_
ROBERT E. ADELMAN (OSC No. 0070262)
LAW OFFICES OF ROBERT E. ADELMAN
49 West Orange Street, Suite No. 1
Chagrin Falls, Ohio  44022
Telephone:  (440) 589-6900
Facsimile:  (440) 589-6902
E-Mail:  office@robertadelmanlaw.com
***Attorney for the Plaintiff,***
***Kenneth R. Kratz***

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff hereby demands a **Trial By Jury** on all issues which are so triable.


_/s/ Robert E. Adelman_
ROBERT E. ADELMAN (OSC No. 0070262)
LAW OFFICES OF ROBERT E. ADELMAN
***Attorney for the Plaintiff,***
***Kenneth R. Kratz***