# EXHIBIT 2

## DEVELOPMENT AND RIGHTS ACQUISITION AGREEMENT

This Agreement (the "Agreement") is made as of this 2nd day of February, 2018 (the "Effective Date"), by and between Convicting a Murderer Docuseries, LLC, an Ohio limited liability company with an address of 625 W. Bagley Road, Berea, OH 44017 ("Producer") and Ken Kratz, with an address of 2520 W. Palisades Dr., Appleton, WI 54915 ("Kratz"). Each of Producer and Kratz shall be referred to hereunder individually as a "Party," and collectively, as the "Parties."

The Parties desire to develop, produce and exploit a docu-drama style television series currently referred to as "Convicting a Murderer", which will address the point of view of the police and prosecutor in the Steven Avery and Brendan Dassey cases (the "Property"). The purpose of the present Agreement is to set forth the parties' respective rights and obligations in connection with the Property.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in further consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

1. <u>Production of Series</u>. Producer agrees to create, develop, produce and attempt to obtain a commitment to exploit a television pilot/series (a "Series") based on the Property.

2. <u>Series Commitment</u>. Producer will use reasonable efforts to obtain a commitment to acquire the Series from a broadcaster, syndicator, cable television entity or other financier (a "Third Party"), and will consult with Kratz regarding Producer's efforts in connection therewith. Producer will have full creative and business control of the Series and over the terms of any agreement with such Third Party (a "Third Party Agreement").

3. <u>Consulting Services</u>. Kratz will provide consulting services in the development of the Series. Such services will include reasonable, non-exclusive consulting services as are customarily rendered by consultants of first-class productions in the United States television industry, as, when and where required by Producer, and Kratz will comply with all reasonable directions, requests, rules and regulations of Producer in connection therewith, whether or not the same involve matters of artistic taste or judgment. Kratz acknowledges that he may be required to work with other individuals assigned by Producer. Kratz will be paid a consulting fee of $4,000 per month for twenty (20) months, commencing on or before March 1, 2018. The results and proceeds of Kratz's consulting services shall be deemed a work made-for-hire specifically ordered by Producer, with Producer being deemed the sole author of such results and proceeds and the owner of all rights of every kind or nature, whether now known or hereafter devised in and to such results and proceeds.

4. <u>Credit</u>. Kratz will be entitled to an end-roll screen credit in connection with consulting services performed hereunder, the form and placement of which shall be at Producer's sole discretion. Producer will not be liable for any inadvertent failure to provide such credit of which Producer has been notified in writing by Kratz, provided that Producer will use reasonable efforts to cure any such failure on a prospective basis.

5. <u>Compensation.</u> As full consideration for all rights, licenses, privileges, waivers and property herein granted, and for all warranties, representations and covenants herein made by Kratz, Producer agrees to pay Kratz as follows:

(a) Fixed Compensation:

(i) A non-refundable payment in the amount of ~~Eighty~~-Five Thousand Dollars (~~$85,000~~), *twenty five* *to Andrew Kratz* payable upon the license or sale of the Series to a Third Party.

(ii) A consulting fee as set forth in paragraph 3, above.

(b) Contingent Compensation:

(i) In the event Producer enters into a Third Party Agreement with respect to the Series, and provided that Kratz is not in material breach of this Agreement, Kratz shall receive a profit participation equal to ~~25~~% of the Producer's share of Net Profits, calculated on the same basis as Producer's net profit participation. 18% *SM* KK

(ii) In the event any other project is developed and/or produced by Producer based substantially on the Property, and provided that Kratz is not in material breach of this Agreement, then Kratz shall receive a net profit participation to be negotiated in good faith, based on industry standards for projects of such type.

(c) Advances: provided that Kratz is not in material breach of this Agreement, then Kratz shall receive the following advance, which will be recoupable against the Contingent Compensation as set forth in paragraph 5(b)(i) and/or 5(b)(ii), above: $25,000 on or before February 15, 2018.

For purposes of this paragraph 5, "Net Profits" shall mean any non-returnable revenue arising from the distribution, merchandising or any other exploitation of the Series and/or any element thereof, including contingent compensation, format fees, bonuses and royalties, as well as any additional non-returnable sums actually received by or irrevocably credited to Producer (and/or any of its agents or representatives for its account), as a result of any other exploitation of the Property and/or any element thereof, less Expenses. "Expenses" shall mean a sum equal to any and all actual, direct out-of-pocket costs and expenses actually incurred by Producer in connection with the development, production and post-production of the Series and its efforts to obtain a Series commitment as set forth herein, including but not limited to delivery costs, provided, that for the purposes of this calculation, the production budget shall be deemed not to exceed $2,500,000, and sales commissions shall not exceed 12.5%.

6. Insurance. Producer will obtain an errors and omissions insurance policy for the Series in a minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate, and will name Kratz as an additional insured on such policy.

7. Grant of rights.

(a) In consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Producer hereby acquires and Kratz hereby assigns, conveys, sells and transfers to Producer all television, motion picture, home-video, Internet, allied, subsidiary and ancillary rights in and to the Property for use by Producer, and Producer's successors and assigns, throughout the world and in perpetuity, including, without limitation, the following rights:

(i) the right to develop one or more scripts based on the Property;

(ii) the right to make one or more television programs, motion pictures or other properties based on the Property, any part thereof or any sequences or characters therein (including, without limitation, theatrical productions, television series and made-for-television movies and made-for-home-video productions);

2

KK

(iii) the right to distribute, exhibit and otherwise exploit any such television programs, motion pictures or other properties in any and all media and by any means now known or hereafter devised, including, without limitation, all forms of theatrical and non-theatrical distribution and exhibition (including, without limitation, free broadcast, pay television, cable, subscription, pay-per-view, video-on-demand, DVD, Internet and mobile devices);

(iv) the right to manufacture, distribute and otherwise exploit all forms of videocassettes, DVDs and other devices of any such television programs, motion pictures or other properties and to combine such television programs, motion pictures or other properties with other programs on such videocassettes, DVDs and other devices;

(v) The unrestricted right to edit, amend, add to, subtract from, use, not use, alter, or otherwise modify, and combine with any other material, the whole or any part of the Property and to publish and otherwise exploit any revision, remake, sequel, prequel, adaptation, translation, dramatization, new issue or other version thereof and to make foreign versions thereof, and in connection therewith;

(vi) the right to publicize, advertise or otherwise promote any such television programs, motion pictures or other properties and in connection therewith to prepare and use synopses of the Property;

(vii) the soundtrack recording, music publishing, legitimate stage, live television, radio broadcasting and merchandising rights to the Property, to any such television programs, motion pictures or other properties based thereon and to any characters contained therein;

(viii) the right to make remakes and sequels to any such television programs, motion pictures or other properties;

(ix) the right to copyright any such television programs, motion pictures or other properties, sound recordings, musical compositions and all other copyrightable works based on or derived from the Property, and to secure copyright and trademark protection to all works based on or derived from the Property;

(x) the rights to use Kratz's name, likeness, sobriquet, voice and biography; to depict, portray, impersonate, reenact, and make use of all the incidents of the Steven Avery and Brendan Dassey cases preceding, surrounding, following and otherwise in any way relating to the Steven Avery and Brendan Dassey cases that the Producer deems in his sole discretion necessary or appropriate to produce one or more television programs or motion pictures and/or other entertainment properties, whether wholly or partially factual or fictional; and use any and all information and materials in Kratz's possession or under Kratz's control, which Kratz shall, at Producer's request, disclose and provide to Producer freely, completely and candidly, in such forms as, without limitation, copies of any newspapers or magazine clippings, photographs, transcripts, journals, notes, recordings, home movies, videotapes or other physical materials relating to the Steven Avery and Brendan Dassey cases and all Kratz's thoughts, observations, recollections, reactions and experiences surrounding, arising out of, concerning all those events, circumstances and activities relating to the Steven Avery and Brendan Dassey cases; and

(xi) the right to sublicense or authorize others to exercise any of the foregoing rights, subject to Producer's obligations hereunder.

3



(b) Kratz reserves all literary rights to the books written by Kratz on the Steven Avery and Brendan Dassey cases. Producer will have the right of first negotiation with respect to the acquisition of rights to adapt said literary works. Kratz will notify Producer in writing if he receives an offer from any third party to acquire such rights, following which there will be an exclusive 90 day period in which Kratz and Producer will negotiate in good faith a literary option and/or purchase agreement with respect to such rights. If no agreement is made to option or acquire such literary rights within 90 days from the date such negotiations commence, Kratz will have the right to negotiate an agreement with a third party or parties with respect to said literary rights.

(c) Notwithstanding anything contained in this Agreement to the contrary, it is Producer's intention to depict the Steven Avery and Brendan Dassey cases as factually as possible. Kratz shall be entitled to review and be consulted on the final shooting scripts of the television programs, motion pictures or other properties produced hereunder, it being understood that further changes to such final shooting scripts may be made by Producer. No approval rights are granted whatsoever in connection with any scripts created or television programs, motion pictures or other properties produced hereunder, which rights shall be held solely and exclusively by Producer and shall include, without limitation, control over all dramatic elements of said scripts and television programs, motion pictures or other properties.

8.  Exclusivity. Producer shall have the exclusive right to engage in development, pre-production and production activities with respect to any work intended to be based on the Property including, without limitation, the preparation and/or submission of treatments, screenplays or other writings based upon the Property, and the negotiation and consummation of agreements relating to any of the rights in or to the Property which may be acquired by Producer hereunder. This applies only to such activities on or after February 2nd, 2018.

9.  Ownership. Copyright in the Property and all elements and derivatives thereof shall be in the name of Producer, provided that Producer may license or assign such copyright as required pursuant to any Third Party Agreement. No other person or Party shall develop any derivative works based on Producer's works or the Property without Producer's prior written consent. The results and proceeds of any services rendered by Kratz or materials created by Kratz in connection with the Property or any television program, motion picture or other work shall be deemed a work made-for-hire specifically ordered by Producer, with Producer being deemed the sole author of such results and proceeds and the owner of all rights of every kind or nature, whether now known or hereafter devised in and to such results and proceeds, and in the event any such results and proceeds are not considered works made-for-hire, Kratz hereby irrevocably assigns, transfers and conveys, in consideration for the compensation provided hereunder, all such results and proceeds and all rights of every kind or nature, whether now known or hereafter devised in and to such results and proceeds to Producer. Kratz hereby waives all rights of "droit moral" or "moral rights of authors" or any similar rights or principles of law that Kratz may now or later have in such results and proceeds. If and to the extent that the foregoing or any other provision of this Agreement does not vest fully and effectively in Producer any or all of the rights described herein, as and when granted or to be granted to Producer hereunder, Kratz hereby absolutely, irrevocably and unconditionally grants and assigns to Producer all such rights not so vested (and, so far as may be appropriate, by way of immediate assignment of future copyright). If and to the extent any "moral rights" may not be granted or assigned to Producer for any reason, Kratz hereby absolutely, irrevocably and unconditionally waives to the maximum extent possible, any and all rights which Kratz may have or claim to have thereunder or under any similar or analogous laws anywhere or as a result of any alleged violation of any such right or to institute any action on the ground that any changes, deletions, additions or other use of the results or proceeds of Kratz's services hereunder violate such rights.

4



10. Representations and Warranties. Each Party represents and warrants that (a) it has the sole, exclusive right to enter into this Agreement, (b) it has not made or assumed, and will not hereafter make or assume, any commitment, agreement or obligation that will or might conflict with or impair any of the rights granted to the Parties hereunder, (c) it has not made and will not make any grant, assignment, commitment or do or permit any act which will or might conflict with or impair any of the rights granted to the Parties hereunder, and (d) such Party's contributions to the Property (i) will be wholly original (except to the extent in the public domain), (ii) will not, to the best of its knowledge in the exercise of reasonable prudence, violate or infringe upon copyright rights, rights of privacy or publicity or any other right of any person or corporate entity and (iii) will not, to the best of its knowledge in the exercise of reasonable prudence, contain any defamatory, libelous, obscene or unlawful matter. Each Party agrees to indemnify and hold harmless the other Party and its respective successors, assigns, officers, employees, shareholders, directors, representatives, agents, designees and licensees (the "Indemnified Parties") from and against any and all third party claims, demands, suits, losses, costs, expenses, damages or recoveries (including reasonable outside attorneys' fees) which are actually obtained against, imposed upon, or suffered by any of the Indemnified Parties, by reason of such Party's (A) breach of any material provision of this Agreement, (B) breach of any material provision of any agreement with a third party relating to the Property, the Series and/or any element thereof, (C) gross negligence or intentional misconduct, or (D) material misrepresentation to any third party regarding the Property, the Series and/or any element thereof.

11. Publicity.

(a) Kratz agrees to appear and participate in publicity interviews, publicity photographs and the like (if and when reasonably requested by the Producer) at such place or places as the Producer reasonably designates, subject to Kratz's prior professional commitments. Producer will provide air and/or ground transportation, hotel accommodations, and $150 per diem for any such appearances that take place more than fifty (50) miles from the Performer's principal place of residence. Otherwise no additional compensation shall be payable for any such services.

(b) Kratz shall not issue or cause to be issued, or participate in, any publicity (other than incidental publicity relating primarily to Kratz, which publicity in no event shall be derogatory) relating to this Agreement, Producer or any designee, successor, licensee or assignee, or any work developed or produced by or under the authority of Producer based on the Property without Producer's written consent in each instance, nor will Kratz enter into any other agreement or arrangement in conflict herewith or in any way attempt to sell, dispose of, encumber or hypothecate any of the rights herein granted or to be granted to Producer or do or knowingly permit to be done any act or thing by which any of said rights could be impaired. Kratz shall not use or permit the use, or purport to use or permit the use, of any of said rights in any manner or for any purpose which would or might unfairly compete with or impair the full and unrestricted use thereof hereunder.

12. Relationship of the Parties. This Agreement shall not constitute a partnership, joint venture, agency, employee/employer, or any other similar relationship among the Parties hereto and the Parties shall at all times be deemed to be independent contracting Parties with respect to this Agreement.

13. Remedies. All remedies hereunder shall be cumulative. Kratz acknowledges and agrees that Kratz's sole remedy for any breach or alleged breach of this Agreement by Producer shall be an action at law to recover monetary damages. In no event shall any of the rights granted or to be granted and/or the releases made herein revert to Kratz, except as provided herein.

5



14. <u>Additional Assurances and Documents:</u> This Agreement is irrevocable and is not only for the Producer's benefit, but also for the benefit of any other party to whom Producer may sell, assign and/or license the rights, privileges, powers or immunities granted herein. Kratz, to the best of Kratz's ability, will prevent the use by others of the rights granted hereunder in a manner inconsistent with the grant of rights to Producer on or after February 2nd, 2018. Producer may prosecute any action, and Kratz irrevocably grants to Producer full power and authority to do so, in Kratz's name, and to take any and all steps as Producer, in Producer's sole discretion may elect, to restrain and prevent others from so using such rights. Kratz further agrees to execute, acknowledge and deliver to Producer any and all further documents, assignments and other instruments, in form approved by counsel for Producer, necessary or expedient to carry out and effectuate the purposes and intent of the parties as herein expressed and/or as deemed necessary or desirable to establish, or defend, Producer's title to any material created hereunder or rights granted hereunder. If Kratz shall fail to so execute and deliver any such assignment or other instruments within ten (10) days of being presented, Producer shall be deemed to be, and Kratz irrevocably appoints Producer, the true and lawful attorney-in-fact of Kratz to execute and deliver any all such assignments and other instruments in the name of Kratz, which right is coupled with an interest. Producer shall provide Kratz with copies of any such instruments or documents executed, verified, acknowledged and delivered by Producer on Kratz's behalf hereunder, provide that Producer's inadvertent failure to provide such copies will not be deemed a breach hereunder.

15. <u>Further Documents.</u> The Parties hereby agree to do all such further acts and deeds consistent with the terms hereof that may from time to time be reasonably required to confirm the Parties' respective rights and obligations hereunder. The Parties further agree to act in good faith hereunder so as to not frustrate the intent of this Agreement.

16. <u>Assignment.</u> Producer may assign the rights to the Property pursuant to any Third Party Agreement for the exploitation of the Property or otherwise. Kratz may not assign any of his rights (other than the right to receive income) or obligations pursuant to this Agreement without the prior written consent of Producer, and any attempted assignment shall be deemed null and void. Notwithstanding the foregoing, each Party shall have the right to assign his rights and obligations under this Agreement solely to a legally formed corporate entity wholly owned by such Party or by such Party and his/her spouse.

17. <u>Notices.</u> Any payments, notices, documents, statements or other writings (collectively referred to herein as "Notices") required or desired to be given hereunder shall be in writing and sent to the addresses noted above. Notices shall be sufficiently given when personally delivered or, if mailed (return receipt requested), three (3) business days from the date of mailing or if sent by e-mail or facsimile with a copy sent concurrently by first class U.S. mail, on the date of transmission.

18. <u>Governing Law.</u> Any claim, controversy or dispute arising hereunder shall be governed by the substantive law of Ohio. Any such claim shall be submitted to arbitration before a single arbitrator in accordance with the rules of the American Arbitration Association held in Cleveland, Ohio. The award of the arbitrator shall be binding upon the parties and judgment may be entered in any court. The prevailing party shall be entitled to collect all arbitration costs and reasonable attorney fees.

19. <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the Parties with respect to the subject matter within, and shall supersede all previous understandings and agreements, whether oral or written. This Agreement shall be binding upon, and shall inure to the benefit of the Parties and their respective heirs, executors, administrators, assignees, licensees and successors in interest, and cannot be modified except by a written instrument signed by the Parties hereof. If one or more provisions of this Agreement are held to be illegal or unenforceable under applicable state law, such illegal or

6



unenforceable portion(s) shall be limited or excluded from this Agreement to the minimum extent required and the remaining portions of this Agreement shall be interpreted as if such portion(s) were so limited or excluded and shall be enforceable in accordance with its terms. This Agreement shall not be amended except by a writing executed by the Parties. This Agreement may be executed in counterparts, including electronic counterparts, and when each of the parties has signed and delivered at least one counterpart, each counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one agreement binding and effective as to each of the parties.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first indicated above.

Convicting a Murderer Docuseries, LLC

By: _____
Shawn Rech, Member

Ken Kratz

With 2/13 amendments.